JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

**Western Union Financial Services, Inc.**

## DEFENDANTS

TERRY GODDARD, in his Official Capacity as Attorney General of the State of Arizona, and his successors,

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ____Maricopa____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Francis J. Burke, Jr. (010570)
Stacey F. Gottlieb (015084)
STEPTOE & JOHNSON LLP
201 E. Washington, Suite 1600
Phoenix, Arizona 85004
Telephone: (602) 257-5200

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1  U.S. Government
Plaintiff
- ☐ 2  U.S. Government
Defendant
- ☒ 3  Federal Question
(U.S. Government Not a Party)
- ☐ 4  Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **Personal Injury** — **Personal Injury** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane — ☐ 362 Personal Injury – Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander — ☐ 365 Personal Injury – Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/CC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine — ☐ 368 Asbestos Personal Injury Product Liability | ☐ 650 Airline Regs. | | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle — **PERSONAL PROPERTY** | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability — ☐ 370 Other Fraud | | | |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury — ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | |
| ☐ 195 Contract Product Liability | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** — **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/ DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting — ☐ 510 Motions to Vacate Sentence | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment — **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations — ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare — ☐ 540 Mandamus & Other | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statute |
| ☐ 290 All Other Real Property | ☒ 450 Other Civil Rights — ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE

2201, 1983

Violation of constitutional rights, privileges and immunities.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $_____

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☐ YES   ☒ NO

## VIII. RELATED CASES(S) IF ANY (See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE   9/19/06

SIGNATURE OF ATTORNEY OF RECORD   /s/ Francis J. Burke, Jr.

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

1  Francis J. Burke, Jr. (010570) fburke@steptoe.com
   Stacey F. Gottlieb (015084) sgottlieb@steptoe.com
2  **STEPTOE & JOHNSON** LLP
   201 East Washington Street, Suite 1600
3  Phoenix, Arizona 85004-2382
   Telephone: (602) 257-5200
4  Facsimile:  (602) 257-5299
5  Attorneys for Western Union Financial Services, Inc.

6              UNITED STATES DISTRICT COURT

7               DISTRICT OF ARIZONA

| | |
|---|---|
| WESTERN UNION FINANCIAL SERVICES, INC. dba WESTERN UNION, | NO. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| TERRY GODDARD, in his Official Capacity as Attorney General of the State of Arizona, and his successors, | |
| Defendants. | |

Plaintiff Western Union Financial Services, Inc. dba Western Union ("Western Union") allege as follows:

## **INTRODUCTION**

1.      On September 18, 2006, Western Union was informed that Attorney General of the State of Arizona Terry Goddard had presented a seizure warrant to the Arizona Superior Court, and that, if issued, Attorney General Goddard intended to seize certain Western Union money transfers from 28 states to Mexico, even if such transfers were not sent from or received in Arizona.  Such seizures would violate the Commerce Clause and the Foreign Commerce Clause of the United States Constitution, the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment, and the right to Freedom of Speech guaranteed by the First Amendment to the United States Constitution, and 42 U.S.C. § 1983.  Such seizures threaten to directly regulate, unduly burden and facially discriminate against money transfers in interstate and foreign commerce.

# NATURE OF THE ACTION

2.      Plaintiff Western Union files its Complaint against Defendant Terry Goddard, the Attorney General of the State of Arizona, and his successors.

3.      On July 31, 2006, Attorney General Goddard issued a final Geographical Targeting Order ("GTO") pursuant to the Arizona Transmitter of Money Act, A.R.S. § 6-1241J, in which he ordered Western Union to provide information about all transfers greater than $300 to or from Sonora, Mexico from or to any location in the world.  A copy of the GTO is attached as Exhibit A.  The Attorney General's explanation for that order is that the Attorney General alleges that money transmitters must file regulatory reports such as suspicious activity reports with the Attorney General of Arizona regarding certain Sonora transactions wherever they may have originated and must have data on all Sonora transactions to determine compliance.

4.      On September 18, 2006, Defendant, through his agent Arizona Department of Public Safety financial crimes investigator Daniel Kelly ("Kelly"), informed Western Union that Defendant has presented a seizure warrant to the Arizona Superior Court.  Western Union has been informed that if seizure is ordered, Defendant will seek for forfeiture all person-to-person money transfers, except for "Quick Collect wires," of $500 or more that (1) are sent from 28 different states[1] and attempted to be paid out at 26 specified Western Union agent locations in Sonora, Mexico, and/or (2) that are sent from one of the 28 states to Mexico on or after the day seizure is initiated and that while waiting to be picked up have been subject to the sender's or receiver's request for a refund, cancellation, or alteration.  All such seizures will herein after collectively be referred to as the "threatened seizures."

---

[1] Western Union is informed that those 28 states are California, New York, Florida, Illinois, Georgia, New Jersey, North Carolina, Virginia, Tennessee, Maryland, Texas, Nevada, South Carolina, Ohio, Pennsylvania, Washington, Alabama, Indiana, Oregon, Colorado, Minnesota, Utah, Connecticut, Michigan, Massachusetts, Wisconsin, Kentucky and Delaware. Western Union also is informed that Defendant will seek such funds sent from Arizona; however, money transfers originating in Arizona are not being contested in this action.

Doc. #507763 v.2 [86348.0029]

5.     Such assertion of regulatory authority over all Sonora transactions and threatened seizures violate the Commerce Clause and the Foreign Commerce Clause of the United States Constitution, and the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment, and the right to Freedom of Speech guaranteed by the First Amendment to the United States Constitution, and 42 U.S.C. § 1983.  Such assertion of regulatory authority over all Sonora transactions and threatened seizures directly regulate, and unduly burden interstate and foreign commerce, are an improper attempt by the Arizona Attorney General to extend his jurisdiction beyond the borders of Arizona, and violate Western Union's right to Freedom of Speech guaranteed by the First Amendment.

6.     Defendant's assertion of regulatory authority over all Sonora transactions and threatened seizures are improper attempts by the Arizona Attorney General to extend his jurisdiction beyond the borders of Arizona to directly regulate and unduly burden interstate and foreign commerce.  The assertion of regulatory authority over all Sonora transactions and the threatened seizures will effectively force Western Union and its agents throughout the United States and Mexico to shut down lawful lines of business, prevent timely delivery of money transmissions as required by the laws of other domestic and foreign states and Western Union's contracts with its customers, and interfere with Western Union's lawful business relationships and contracts with its agents, all causing irreparable harm.

7.     Western Union seeks declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 on the grounds that the assertion of regulatory authority and threatened seizures violate the Constitution of the United States, and seeks further relief pursuant to 43 U.S.C. § 1983.  Western Union also seeks a permanent injunction barring Defendant from:

a.     seizing or attempting to seize money transfer funds in Western Union's possession, custody, or control, for any transaction that was not sent from or received in Arizona or that is otherwise outside the scope of Defendant's statutory jurisdiction;

a.     prohibiting or interfering with Western Union's compliance with its legal and contractual obligations to deliver transferred funds to the receiver identified by the sender of money transfers that are not sent from or received in Arizona; and

a.     violating the Commerce Clause, Foreign Commerce, the Due Process

3

1

Clause and the Equal Protection Clause of the Fourteenth Amendment, and the right to Freedom of Speech under the First Amendment by improper regulation of money transfers and associated banking transactions taking place in interstate and foreign commerce.

2

3   8.   Western Union has no adequate remedy at law.

4   9.   An actual controversy exists between the parties concerning their respective

5   rights and duties.  Defendant's assertion of regulatory authority and request to the Arizona

6   Superior Court for issue of the seizure warrant makes this controversy definite and concrete,

7   touching on the parties' adverse legal interests, and amenable to specific relief through a

8   declaratory judgment.

9   10.   The relief requested in this action is sought against Defendant, as well as

10   against each of Defendant's officers, employees, agents, and all persons acting in

11   cooperation with Defendant, under his supervision, at his direction, or under his control.

12   **PARTIES**

13   11.   Plaintiff Western Union is a corporation organized under the laws of the State

14   of Colorado with its principal place of business in Englewood, Colorado.  Western Union is

15   a financial services company whose primary business involves transmitting money sent by

16   one person to another person through interstate and/or foreign commerce via interstate or

17   international wire.   Under various statutes and regulations, it is described as a financial

18   institution, money services business, and money transmitter.  In Arizona, Western Union is

19   licensed to conduct business as a money transmitter under the State's Transmitters of Money

20   Act, A.R.S. §§ 6-1201 *et seq.*

21   12.   Defendant Terry Goddard is the Attorney General of the State of Arizona and

22   is a defendant in his official capacity.  Defendant Goddard and his successors are referred to

23   herein as the "Attorney General."

24   **JURISDICTION AND VENUE**

25   13.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, and 2202.

26   14.   Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391

27   because it is where Defendant resides.

28

4

Doc. #507763 v.2 [86348.0029]

**FACTUAL ALLEGATIONS**

A.   **Western Union's Business**

15.   Western Union is a financial services company. Western Union's primary business involves transmitting money sent by one person to another person through interstate and/or foreign commerce by use of intrastate or international wire.  While it began as a telegraph company, today, Western Union is a global leader in money transfer services, helping consumers and businesses send money and bill payments quickly, conveniently, and reliably.

16.   The typical Western Union customer uses its money transfer services for a wide variety of legitimate purposes, including, among other things, living expenses, automobile repairs, travel, medical treatment, educational expenses, and special occasion gifts.

17.   Western Union's success is founded on and maintained by its ability to quickly, conveniently, and reliably help its customers transfer money.  Western Union's brand has become synonymous with speed, reliability, convenience, and trust in sending money.  Western Union's brand value, reputation, and goodwill suffer significant damages if Western Union does not deliver money transfers within the contracted time.

18.   Western Union offers services through a global network of more than 270,000 agent locations in all 50 states and the District of Columbia, and in more than 195 foreign countries.  It does business through local authorized agents, most of which conduct other retail business at the same location. Western Union agents include large, publicly-owned networks—such as post offices in many countries including France, Germany, China, India and New Zealand—as well as private chains such as DHL, large national retailers such as Elektra in Mexico, and banks in such countries as Germany and Japan.

19.   In addition to offering money orders, and payment services for things such as home and car loans, utilities, insurance, and child support, Western Union's basic service is providing consumer-to-consumer cash transfers, or "will call" money transfer service. Essentially, the money transfer service involves the receipt of money from a Western Union

Doc. #507763 v.2 [86348.0029]

1  customer with directions to transmit that money electronically to a designated recipient in the
2  form of cash or check, or through a transaction at an ATM type machine in some locations.

3       20.    Western Union's legal duties and obligations have several sources.  First,
4  money transfer senders and receivers are entitled to certain rights, and certain obligations
5  under the law of the jurisdiction in which the customer sends or receives money.  Western
6  Union must honor those rights and obligations.  In addition to these background legal rules,
7  all money transfers are governed by contractual terms and conditions agreed to by Western
8  Union and its customers, *see, e.g.*, Terms & Conditions for internet transactions attached
9  Exhibit B, and the settlement transactions are governed by independent contracts between
10 Western Union and its agents.

11      21.    Western Union offers three different money transfer services to its customers:
12 Will Call (global, but known as "Dinero in Minutos" in Mexico); Next Day (in Mexico), and
13 Direct to Bank (global).  These services allow Western Union's customers to send money by
14 phone or from an agent location.  Western Union's customers who send money using its Will
15 Call service or its Direct to Bank services also have the option of sending money online.

16      **B.    Money Transfers Constitute Interstate and Foreign Commerce**

17      22.    Transactions may be initiated at a Western Union agent location, by
18 telephone, or over the internet and can be picked up at any Western Union location
19 throughout the world on a "will call" basis.  Every domestic money transfer to a send and
20 receive location within the United States constitutes interstate commerce, carried through the
21 interstate wires.  Every money transfer that is sent from or received in a foreign nation, such
22 as Mexico, constitutes both interstate and foreign commerce because each transfer uses the
23 interstate wires as well as the international wires.  Each money transfer generates additional,
24 related interstate and foreign commerce transactions in connection with collection and
25 reimbursement of agent funds and payment of agent commissions.

26      a.    **Money Transfer "Send" Transaction**

27      23.    In a typical transaction conducted using Western Union's online service
28 option, a consumer who wishes to send money logs onto www.westernunion.com, which

Doc. #507763 v.2 [86348.0029]

connects the customer to Western Union servers located in State A, State B, or, in the case of

an international customers, Ireland; inputs information into an online "Send Money" form;

and pays for the transaction, usually using a credit card, along with the service fee, to

Western Union.[2]  From the Western Union server, the information is sent to Western Union

data processing system and then to the mainframe computer located at Western Union's data

processing center, located in State C (the "mainframe"), where it is processed further, and

stored.

24.     In a typical transaction conducted using Western Union's transfer by phone

service option, a consumer who wishes to send money calls Western Union's 1-800-CALL-

CASH, provides a Western Union customer service representative (a "CSR") located in

Texas, Missouri, West Virginia, or beginning at the end of this month, in Mexico City, with

the information to complete an electronic "Send Money" form, and pays for the transaction,

using a credit card, along with the service fee, to Western Union.

25.     If, however, the sender is calling from an agent location from a special direct-

connect telephone, the call is routed to a CSR at a call center in Costa Rica, Texas (usually

special language calls) or the Dominican Republic, and the sender pays the local agent in

cash for the transfer.  Nevertheless, under either scenario, the CSR enters the details of the

transaction into a computer terminal linked to a Western Union data processing system

where it is sent to the mainframe located in State C, where it is processed further, and stored.

26.     When a Western Union customer uses a credit card to pay funds to Western

Union, a Western Union data processing system will communicate with non-Western Union

---

[2] For security reasons, due to the nature of the information stored at its three data processing centers, Western Union keeps the locations of such centers secret and confidential.  They are not, however, located in Arizona.  Accordingly, Western Union will refer to a particular state where such a center is located as, for example, "State A."  Thus, if a data processing center is located in Hawaii and another is located in Wyoming, Hawaii may throughout the Complaint be referred to as "State A" and Wyoming may throughout the Complaint be referred to as "State B."  If the Court believes that it is necessary to know the actual location of a Western Union data processing center, Western Union will provide the Court with that information in camera to keep that information confidential.  Unless otherwise noted, individual Western Union data processing centers, whether it is located in State A, B, or C, will be referred to as a "Data Processing Center."

Doc. #507763 v.2 [86348.0029]

merchant service and non-Western Union risk scoring processing centers in Maryland, Colorado, and Texas.

27.     In a typical transaction conducted using a Western Union agent, a consumer who wishes to send money enters a Western Union agent location, fills out a "Send Money" form [*see, e.g.,* U.S. Send Money form attached as Exhibit C], provides any required supporting documentation, and delivers the money, in cash along with the service fee, to the agent.   The Western Union agent enters the details of the transaction into a computer terminal linked to a Western Union data processing system.   The information flows from the agent location to the mainframe at Western Union's data processing center located in State C, where it is processed further, and stored.

28.     Western Union assigns each money transfer a unique "Money Transfer Control Number," which is provided to the sender for him or her to communicate to the recipient.

29.     After a Western Union agent receives funds from the sender, the agent will deposit the cash in trust for Western Union into its bank account.   A Western Union processing center in State C will then cause a separate back-office system located in State C to create an Automated Clearing House ("ACH") file to debit the agent bank account for the funds collected from the sender.   Western Union then sends the ACH debit file to its Originating Depository Financial Institution ("ODFI") for processing.   The ODFI processes the ACH debit file and, the next business day, Western Union account is credited.

30.     A few large "chain" agents, such as a chain of supermarkets, send the funds deposited into their accounts in trust for Western Union via Federal Reserve wire to Western Union's operating account rather than have Western Union ACH their bank account.

### b.     The Money Transfer "Payout" Transaction

31.     After the information from the "Send Form" is entered into a Western Union data processing system and reaches Western Union's data processing center in State C, the processing centers mainframe will reflect that the funds are available for payout.

Doc. #507763 v.2 [86348.0029]

32.     Once the transaction has been successfully created by the system, Western Union maintains money transfer funds, until such time as the transaction is paid, as required by the laws applicable to the state in which the money transfer originated, that is, in accounts backed by permissible investments stated by various U.S. governmental agencies such as the Department of the Treasury.

33.     Western Union money transfers usually can be retrieved within 10 to 15 minutes after the transaction is initiated.  "Dinero en Minutos" money transfers to Mexico are usually available for pick up by the receiver within minutes, on a "will-call" basis, at any Western Union Dinero en Minutos agent location in Mexico.

34.     However, until such time as the funds are paid out, Western Union's customer, that is the sender of funds, may, upon written request, cancel the money transfer and receive a refund of the principal amount.  Some states, such as California, have laws that govern Western Union's customer's right to refund.

35.     To receive funds, a recipient enters a Western Union agent location, completes the "Receive Money" form and presents it, along with identification and the Money Transfer Control Number, to the agent. The agent confirms the documentation, and takes whatever security actions are required (such as copying the recipient's identification). Then, using a point of sale computer that links to Western Union's mainframe in State C, the agent locates the money transfer on the mainframe, initiates the actual payment process by selecting the transaction from the mainframe.

36.     In the United States, most transfers are paid out in check, although some are paid in cash.  If the transfer is paid out in check, the agent issues a Western Union money transfer check drawn on Western Union's bank account in Colorado payable to the recipient. Typically, the recipient generally signs the check over to the agent, creating a third party check, and the agent pays the recipient cash.  The agent then deposits the third party check in its bank account for reimbursement of the funds paid-out to the recipient.  However, outside of the United States, almost all money transfers are paid out in case.  Western Union settles with these agents daily via Federal Reserve wire transfer.  Thus, in Sonora, Mexico, the

1   receive agent locates the transaction from the mainframe, pays the recipient in cash using the

2   agent's own funds, and then reconciles with Western Union on a daily basis.

3       37.     Every Western Union money transfer constitutes interstate and foreign

4   commerce in various ways through the:

  (i) Use of telephone lines to initiate money transfers by calling Western Union
    directly;

  (ii) Use of telephone lines, and interstate and foreign wires to transmit data and
    funds electronically from the state where the transfer originates to a Western
    Union data processing system to Western Union's data processing center
    located in State C, and ultimately to Mexico; and/or

  (iii) Use of telephone lines, and interstate and foreign wires to transmit data and
    funds to reimburse and settle transactions with Western Union agents, to pay
    their commissions for sending or receiving and advancing payment for
    Western Union money transfers.

**C. Compensation of Western Union Agents Involves Interstate and Foreign Commerce**

13      38.     Western Union's relationship with its agents is governed by a contract.

14      39.     Pursuant to the terms of their contracts, Western Unions pays a commission to

15  the receive agent for each money transfer it pays out.  The process of reimbursing the agent

16  for processing the payout to the receiver is referred to as "settlement."  Compensation of

17  Western Union agents for their services in processing money transfers also involves

18  interstate and/or foreign commerce.  Pursuant to the terms of Western Union's contractual

19  agreements with its agents, Western Union settles with each agent at the end of each

20  settlement period.  For domestic transactions, commissions are paid monthly by check or

21  ACH.  For international transactions, commissions are settled on a "net" basis and agents are

22  paid daily via Federal Reserve wire transfers.

**D. The Threatened Seizures**

24      40.     Defendant, through his agent Kelly, has informed Western Union that, if the

25  seizure warrant is signed, Defendant will seek for forfeiture person-to-person money

26  transfers of $500 or more that are (1) attempted to be paid out at 26 specified Western Union

27  agent locations in Sonora, Mexico, and that were sent from one of 28 different states,; or (2)

28  that are sent from one of the 28 states to Mexico on or after the day the seizure is initiated,

1  and that while waiting to be picked up have been subject to the sender's or receiver's request

2  for a refund, cancellation, or alteration.  These transactions will never have been sent to,

3  routed through, or received in Arizona.

4      41.    Defendant, through his agent Kelly, has informed Western Union that he will

5  continue to seize money transfers for four weeks.  In the past, Defendant has sought "back-

6  to-back" seizures that resulted in seizures continuing for a total of eight consecutive weeks.

7      42.    In the past, Defendant has seized money transfers sent to or received in

8  Arizona.  That is, Defendant seized funds that were being received in Arizona, and have

9  never seized funds from money transfers that were exclusively sent from or received in other

10  states or countries (not Arizona).

11      43.    Defendant's previous seizures seized (1) funds sent to "targeted names," that

12  is, funds sent to a particular receiver Arizona, (2) funds sent to particular agent locations in

13  Arizona, or (3) funds that were being sent to Arizona from specific states, which Defendant

14  typically refers to as corridor states.

15      44.    When law enforcement seizes funds being sent using Western Union, the

16  system Western Union has put in place to respond to such seizures (the "Western Union

17  system") will identify such funds when the money transfer transaction is initiated.  That is,

18  the funds are "seized" when they are sent, not when they are being picked up.

19      45.    Unlike money transfers sent to an individual state in the United States, the

20  Western Union system does not have the ability to discriminate between individual states

21  or provinces in a foreign country. This means that Western Union does not have the ability

22  to restrict the seizure of funds being sent to foreign countries to individual states or

23  provinces within that country.  Consequently, if Defendant seeks funds sent to Sonora,

24  Mexico, but not specify a particular Western Union agent location in Sonora, the Western

25  Union system will seize all funds sent to Mexico, even if those funds are being sent to a

26  Mexican state other than Sonora.

27      46.    Unlike funds seized pursuant to a warrant that seeks seizure of all transfers

28  into a country, the funds that are seized because they are sent to a specified agent location

Doc. #507763 v.2 [86348.0029]

are seized at the time of pick-up, not when the money transfer is initiated.  This is because a person seeking to pick-up money sent to him or her using Western Union is not obligated to pick up the funds at any particular Western Union agent location.  In fact, in some cases, the person can pick up the funds at any Western Union agent location anywhere in the world.  The effect of this is that if Defendant seeks funds sent to Sonora, Mexico that are picked up at a particular agent location, those funds are not seized until the payout process has begun and the funds are for all intents and purposes located outside the United States in Sonora, Mexico.

47.     The threatened seizures of money transfers to Mexico that have been subject to a request for a refund, cancellation, or alteration will directly regulate interstate commerce.  All requests to alter a Western Union money transfer must be done by calling Western Union's customer service center ("CSC") in Missouri, and all requests to cancel or for a refund must be written.  Thus, if, for example, a Western Union customer in California needs to correct the misspelling of the name of a designated recipient located anywhere in Mexico because a Western Union agent accidentally entered the recipient's name incorrectly into the computer, the customer must call the CDC in Missouri to effect the change.  By regulating such transactions, the Attorney General would be directly regulating interstate commerce.

48.     The threatened seizure exposes Western Union to potential liability because under certain state laws Western Union has a liability to its customer in an amount equal to the forfeited funds.  In fact, if Western Union fails to pay out funds to the designated recipient in violation of its contractual obligations with its customer, Western Union could be subject to potential regulatory sanctions under some state laws. Similarly, if Western Union fails to refund a customers funds, Western Union could be violating some state laws that require Western Union to honor customer refund requests.

49.     In the past, after the Attorney General has seized funds from Western Union, the senders and/or receivers of those funds are required to go through interrogation by Arizona law enforcement officers (or to provide information to Western Union who is

12

1    ordered to then provide it to Arizona law enforcement).  The Attorney General is thus

2    projecting his authority beyond Arizona for his overly broad seizure of wholly legitimate

3    money transfers by requiring citizens of foreign states and nations who have never had any

4    contact with Arizona to be interrogated by Arizona law enforcement before releasing the

5    seized funds.

6        50.    Finally, consistent with Defendant's past practices, Western Union expects

7    Defendant will seize the money transfers to Mexico pursuant to A.R.S. §§ 13-2314 and 13-

8    4201 *et seq.*   A.R.S. § 13-4202, however, explicitly limits Defendant's jurisdiction in

9    forfeiture actions to "property . . . within [the State] at the time of the filing of the action or if

10   the courts of [the State] have in personam jurisdiction of an owner or interest holder in the

11   property."

12       **E.    Money Transfers to Mexico**

13       51.    According to The World Bank, Mexico ranks among the top money transfer

14   recipients in the world.[3]

15       52.    According to The World Bank, in comparison with other recipient countries,

16   which typically receive considerable money transfers from several countries, Mexico has a

17   unique "bilateral relationship" with the United States, from which the vast majority of its

18   money transfers, or remittances, originate.

19       53.    According to The World Bank, the increasing size of the Mexican population

20   living in the United States has resulted in the rapid increase in the number of potential money

21   transfers, and the growth of money transfers to Mexico is driven primarily by the large

22   number of Mexican workers living in the United States.   "The typical remitter is a hard-

23   working immigrant, documented or undocumented, who wants to improve the life of his or

24   her family and community of origin by providing additional income."   In fact, The World

25   ───────────────

26       [3]   Unless otherwise noted, paragraphs 52-59 of the Complaint are based on the case
     study published by The World Bank: Raul Hernandez-Coss, The U.S.-Mexico Remittance
     Corridor, *Lessons on Shifting from Informal to Formal Transfer Systems* (World Bank
27   Working Paper No. 47, 2005), a copy of which is attached at Exhibit D.  According Working
     Paper No. 47, Mr. Hernandez-Coss is Financial Sector Specialist in the Financial Market
28   Integrity Unit of The World Bank.

Doc. #507763 v.2 [86348.0029]

Bank reports that nearly one in five Mexican adults receives money from relatives employed in the United States.

54.    This growth has been so substantial that, according to The World Bank, from 1998 to 2003, worker remittances became a increasing important to Mexico's economy.  In 2003, remittances were Mexico's second largest source of external finance, second only to oil, surpassing foreign direct investment and tourism.  For example, in 2003, remittances to Mexico surpassed $13 billion, approximately 2.2 percent of Mexico' gross domestic product.

55.    According to The World Bank, money transfers from the United States to Mexico (the U.S.-Mexico corridor) is at "an advanced state of shifting from informal [money transfer systems] to formal [money transfer] systems."  The World Bank reports that in addition to traditional money transmitters like Western Union and Money Gram, banking institutions, credit unions, debit and credit card companies, microfinance institutions, and rural financial institutions now compete for market share.

56.    According to a Bank of America August 17, 2004 news release, its remittance service to Mexico grew 67 percent in the first six months of 2004.  A copy of the news release is attached as Exhibit E, and available on Bank of America's website http://newsroom.bankofamerica.com.  In 2004, according to a Wells Fargo June 10, 2004 News Release, Wells Fargo partnered with HSBC Mexico to create what it considered "the largest distribution channel among U.S. banks for consumer remittance customers in Mexico."  A copy of the news release attached as Exhibit F, and available on its website www.wellsfargo.com/press.

57.    Among the reasons cited by the World Bank for the transformation of the money transfer market from a largely informal industry to one primarily based on electronic transfers through formal institutions like Western Union includes bilateral initiatives by the United States and Mexican governments and the monetary authorities of the two countries.

58.    With respect to the cooperative efforts of the United States and Mexican governments, according to The World Bank, "Mexico has a broad network of bilateral agreements with the United States, including Financial Information Exchange Agreement

Doc. #507763 v.2 [86348.0029]

1  and the Memorandum of Understanding for the Exchange of Information on the Cross-
2  Border Movement of Currency and Monetary Instruments."  The World Bank describes
3  another such effort where the U.S. Federal Reserve System is working to expand its
4  Automated Clearing House to support two-way credit transactions between the United States
5  and Mexico.  According to Federal Reserve Board Chairman, Ben S. Bernanke, "Providing
6  service to Mexico is also an important step for the U.S.-Mexican Partnership for Prosperity,
7  and agreement designed to improve financial linkages between the two countries."  *See*
8  Transcripts of Chairman Bernanke's remarks given at Access for Immigrants:  Learning
9  from Diverse Perspectives conference, Federal Reserve Bank of Chicago, Chicago, Illinois
10  (April 16, 2004) attached as Exhibit G.

**CLAIMS FOR RELIEF**
**COUNT I**
**COMMERCE CLAUSE**

13  59.     Western Union incorporates by reference its allegations in Paragraphs 1
14  through 58 as set forth above.

15  60.     The assertion of regulatory authority over Sonora transactions and threatened
16  seizures, as described above, would violate the Commerce Clause of the United States
17  Constitution because they would place an intolerable burden on interstate commerce by
18  subjecting interstate money transmissions to the laws of a single State, Arizona.

19  61.     For example, the assertion of regulatory authority over Sonora transactions
20  and threatened seizures would violate the Commerce Clause by directly regulating
21  commercial activity outside of Arizona by imposing Arizona's forfeiture laws on money
22  transfers that take place entirely outside of Arizona, thus subjecting interstate money
23  transmissions to the laws of a single State, Arizona.

24  62.     The assertion of regulatory authority over Sonora transactions and threatened
25  seizures would further violate the Commerce Clause by discriminating against businesses
26  engaged in interstate commerce in 28 States, yet leaving the remaining States free to conduct
27  money transfers to Mexico without interference.

Doc. #507763 v.2 [86348.0029]

63.     Less discriminatory and burdensome alternatives are available to preserve any legitimate local interests:  the seizure of funds in a manner consistent with Defendant's lawful exercise of his jurisdiction would be adequate to preserve any local interests at stake.

## COUNT II
## FOREIGN COMMERCE CLAUSE

64.     Western Union incorporates by reference its allegations in Paragraphs 1 through 63 as set forth above.

65.     Money transfers, as described above, are acts of interstate and/or foreign commerce.

66.     The assertion of regulatory authority over Sonora transactions and threatened seizures, as described above, would violate the Foreign Commerce Clause of the United States Constitution because they would place an intolerable burden on foreign commerce.

67.     The assertion of regulatory authority over Sonora transactions and threatened seizures would violate the Foreign Commerce Clause by improperly regulating foreign commerce, a power reserved to the federal government, by enforcing Arizona's laws in Mexico.

68.     The assertion of regulatory authority over Sonora transactions and threatened seizures would further violate the Foreign Commerce Clause by unduly burdening Western Union's ability to conduct commercial activities on a international basis via the internet and telephone wires.

69.     The assertion of regulatory authority over Sonora transactions and threatened seizures would further violate the Foreign Commerce Clause by singling out Western Union and essentially banning it from being able to continue its money transfer business to Sonora, Mexico.

70.     The assertion of regulatory authority over Sonora transactions and threatened seizures would further violate the Foreign Commerce Clause by improperly regulating foreign commerce, a power reserved to the federal government, by seizing funds that were

Doc. #507763 v.2 [86348.0029]

intended to facilitate lawful foreign commerce and is therefore inimical to the national commerce.

## COUNT III
## DUE PROCESS

71.     Western Union incorporates by reference its allegations in Paragraphs 1 through 70 as set forth above.

72.     The assertion of regulatory authority over Senora transactions and threatened seizures, as described above, would violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution

73.     For example, the assertion of regulatory authority over Sonora transactions and threatened seizures would violate the Due Process Clause of the Fourteenth Amendment by improperly extending the money transmitter statutes and forfeiture laws of the State of Arizona beyond state borders and attempt to control commercial activity in other States.

74.     The assertion of regulatory authority over Sonora transactions and threatened seizures would further violate the Due Process Clause by imposing the laws of the State of Arizona on citizens of other states and foreign nationals who have never had any contact with the State of Arizona and who can have no reasonable expectation of being subject to Arizona law.

75.     The assertion of regulatory authority over Sonora transactions and threatened seizures would further violate the Due Process Clause by interfering with contracts entered into and performed entirely outside the State of Arizona.

76.     The threatened seizures would further violate the Due Process Clause because they would improperly seize property located outside the State of Arizona thereby violating the guaranty against deprivation of property without due process of law.

## COUNT IV
## VIOLATION OF THE EQUAL PROTECTION CLAUSE

77.     Western Union incorporates by reference its allegations in Paragraphs 1 through 76 as set forth above.

Doc. #507763 v.2 [86348.0029]

78.     The assertion of regulatory authority over Sonora transactions and threatened seizures, as described above, violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

79.     For example, the assertion of regulatory authority over Sonora transactions and threatened seizures would violate the Equal Protection Clause in that they constitute and arbitrary and irrational classification, singling out Western Union among the numerous entities that send funds to Sonora, Mexico for unfair and unequal treatment.

80.     The assertion of regulatory authority over Sonora transactions and threatened seizures would further violate the Equal Protection Clause in that they constitute an arbitrary and irrational classification, selecting only 28 states and their citizens for unfair and unequal treatment.

81.     The assertion of regulatory authority over Sonora transactions and threatened seizures of Western Union transactions is not rationally related to any legitimate government purpose.

**COUNT V**
**VIOLATION OF THE FIRST AMENDMENT**

82.     Western Union incorporates by reference its allegations in Paragraphs 1 through 81 as set forth above.

83.     The threatened seizure violates the free speech guarantees in the First Amendment to the United States Constitution because it is an impermissible restriction on speech that reaches far beyond the boarders of Arizona.

84.     Defendant does not have substantial state interest in seizing funds that were neither have been sent to or received in Arizona, but that were being sent to Sonora, Mexico for entirely legitimate purposes, and his doing so does not directly advance any substantial interest, and the restriction is not sufficiently narrowly tailored to achieve any substantial interest.

85.     The threatened seizure is accompanied by Defendant's threat of criminal prosecution if Western Union were to warn its customers that money transfers to Sonora,

Doc. #507763 v.2 [86348.0029]

Mexico would be delayed due to the State of Arizona's exercise of extraterritorial jurisdiction over their funds.

86. If Western Union were prohibited from informing its customers that their money transfers to Mexico cannot be refunded, cancelled, or altered, or that their money transfers would be delayed and might not arrive at all, every affected customer will lose trust in the credibility, speed, accuracy and reliability of the Western Union name, brand and reputation.

87. Western Union will be prevented from exercising its right to Freedom of Speech (albeit commercial speech) and losing its customers and goodwill, or face the risk of prosecution for disclosing the seizure regulation. The overbreadth of the threatened seizure and the threat of criminal sanctions punishes and chills speech protected by the First Amendment.

**COUNT VI**
**VIOLATION OF 42 U.S.C. § 1983**

88. Western Union incorporates by reference its allegations in Paragraphs 1 through 87 as set forth above.

89. Defendant, acting in his official capacity as Attorney General, has asserted authority to regulate money transfers to Sonora, Mexico and have threatened to seize money transfers, all person-to-person money transfers, except for "Quick Collect wires," of $500 or more that are either (1) attempted to be received at 26 specified Western Union agent locations in Sonora, Mexico, and that were sent from 28 different states; or (2) that originated from one of the 28 states, that were sent to Mexico on or after the day the seizure is initiated, and that while waiting to be picked up have been subject to the sender's or receiver's request for a refund, cancellation, or alteration that are not sent from or received in Arizona. This conduct constitutes state action under color of law.

90. The state action deprives Western Union of rights, privileges and immunities guaranteed by the United States Constitution.

91. The State of Arizona is bound by these rights, privileges and immunities.

Doc. #507763 v.2 [86348.0029]

92.    The state action violates the Commerce, Equal Protection and Due Process Clauses of, and the First and Fourteenth Amendments to the United States Constitution to the injury of Western Union.

93.    As a result of the State of Arizona's violations, Western Union will suffer harm in the form of seized transfer funds, loss of business, loss of good will, damage to its reputation, and contractual and other irreparable harm damages presently incalculable for not delivering the seized funds to its patrons.

94.    Western Union is the type of plaintiff intended to benefit from the Commerce Clause and the Foreign Commerce Clause of the United States Constitution, and the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment and the free speech guaranteed by the First Amendment to the United States Constitution.

95.    The assertion of regulatory authority over Sonora transactions and threatened seizure would deprive Western Union of numerous rights secured by the United States Constitution (as set forth in Counts I-VI) under color of state law, thereby violating 42 U.S.C. § 1983.

## IRREPARABLE INJURY

96.    Western Union faces the prospect of immediate, severe and irreparable injury once the seizure warrant is issued and becomes effective.  By way of example only, the injuries include:  (1) the threat of incalculable damages through the permanent loss of customers, damage to its brand name and good will, and potential loss of its relationships with its agents; (2) and the threat of the deprivation of its constitutional rights, including its right to engage in interstate commerce.

## RELIEF REQUESTED

1.    Western Union respectfully requests that this Court, pursuant to 28 U.S.C. § 2201, enter a declaratory judgment stating the seizure of money transfers violates the Commerce Clause and the Foreign Commerce Clause of the United States Constitution, and the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment

Doc. #507763 v.2 [86348.0029]

1   and the Freedom of Speech guaranteed by the First Amendment to the United States

2   Constitution, and 42 U.S.C. § 1983.

3        2.      Western Union respectfully requests that this Court enter a permanent

4   injunction barring Defendant from:

5        (i)     seizing or attempting to seize money transfer funds in Western Union's
                  possession, custody, or control, for any transaction that was not sent from or
6                 received in Arizona or that is otherwise outside the scope of Defendant's
                  statutory jurisdiction;
7

8        (ii)    prohibiting or interfering with Western Union's compliance with its legal
                  and contractual obligations to deliver transferred funds to the receiver
9                 identified by the sender of money transfers that are not sent from or received
                  in Arizona; and

10       (iii)   violating the Commerce Clause, Foreign Commerce Clause, the Due Process
                  Clause and the Equal Protection Clause of the Fourteenth Amendment, and
11                the right to the Freedom of Speech under the First Amendment by improper
                  regulation of money transfers and associated banking transactions taking
12                place in interstate and foreign commerce.

13       3.      Western Union respectfully requests costs of suit, including reasonable

14   attorney' fees under 42 U.S.C. §1988, and all further relief to which it may be entitled.

15            DATED this 19th day of September, 2006.

16                                    STEPTOE & JOHNSON LLP

17

18                                    By/s/ FRANCIS J. BURKE, JR.

19                                       Francis J. Burke, Jr.
                                         Stacey F. Gottlieb
20                                       201 East Washington Street, Suite 1600
                                         Phoenix, Arizona 85004-2382

21                                    Attorneys for Western Union Financial Services,
                                      Inc.
22

23

24

25

26

27

28

Doc. #507763 v.2 [86348.0029]